UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

CHRISTOPHER KARNACK,

      Plaintiff,

v.

WASTE MANAGEMENT, INC.,
d/b/a WM, and
TIM LUCAS,

      Defendants.

Case No. 1:26-CV-1673

Hon. _____

_____

# COMPLAINT AND JURY DEMAND

_____

## COMPLAINT

Plaintiff Christopher Karnack, by and through his attorneys, Pinsky Smith, PC, state as follows:

### JURISDICTION, VENUE, AND PARTIES

1.    This is an action seeking damages to remedy violations of Plaintiff's rights to be free from race discrimination, and to be free from retaliation for objecting to discrimination. Plaintiff's claims are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* ("ELCRA").

2.    Jurisdiction and venue are proper in this Court.

3.     Plaintiff is a Black male who resides in Kent County, Michigan, within the Western District of Michigan.

4.     Defendant Waste Management, Inc., doing business as WM, is an Illinois corporation, but headquartered in Houston, Texas. It operates trash collection, recycling, and other waste management services nationwide and internationally.

5.     Defendant Tim Lucas is a white male who, upon information and belief, resides in Ottawa County, Michigan. Defendant Lucas is a Senior District Manager for WM, who works out of the Wyoming, Michigan location.

## FACTUAL ALLEGATIONS

6.     Plaintiff started working for WM in Marquette, Michigan in 2020 as a residential driver for trash. Looking for better opportunities for his family, Plaintiff applied for a new job with WM in its Wyoming, Michigan location that paid significantly more money and came with overtime work opportunity. WM offered the job to Plaintiff, and he accepted and moved his entire family to the Grand Rapids area to begin the new position.

7.     Plaintiff reported to Mike Wygant, the route manager, when Plaintiff began his position in Wyoming. Mr. Wygant reported to Defendant Lucas. Mr. Wygant, too, also transferred to the Wyoming location around the time that Plaintiff did. Mr. Wygant's predecessor who hired Plaintiff left his position at the Wyoming location close in time to when Plaintiff started.

8.     Plaintiff later learned that when Mr. Wygant started, Defendant Lucas

told Mr. Wygant, without other explanation, that he needed to "keep an eye on" Plaintiff and two other employees – the three of whom were the only employees at the Wyoming location of WM who were not white.

9.    Almost immediately, Defendants decreased the hours offered to Plaintiff, who had specifically taken the position at WM's Wyoming location in part because he was promised a consistent 40-hour per week schedule with opportunities for overtime work. Plaintiff learned that it was because of Defendant Lucas that Defendants reneged on their promise for 40 hours per week of work assignment to Plaintiff. When Plaintiff asked Mr. Wygant about this, he responded that Defendant Lucas said that Plaintiff was not being efficient, that he was taking too long to complete his tasks, and that Mr. Wygant could not schedule Plaintiff for a full 40 hours per week or for overtime based on Defendant Lucas's direction. When Plaintiff asked for feedback and specifics about Defendant Lucas's allegations, Plaintiff and Mr. Wygant discovered that Defendants had not provided Plaintiff some critical training and equipment that was given to other employees.

10.    For example, Mr. Wygant discovered that Plaintiff had not been given a compactor key and did not know that he was supposed to have one or be able to use the compactor. In another example, when Plaintiff tried to get the training to use a roll-off truck, his training was unusually abbreviated and did not cover what that training usually did for other employees. Defendants never told Plaintiff that there was an efficiency standard that had to be met when driving the roll-off truck, sent Plaintiff out to start driving this type of truck without telling him this, and

3

then noted Plaintiff's subsequent failure to meet the standard that he did not know existed.

11.    Nevertheless, Plaintiff chalked this up to accidental omissions by Defendants, pressed ahead with doing his best work, and sought out training on additional tasks. But Plaintiff waited for opportunities to train on tasks that were immediately given to newer white employees who started after Plaintiff. Plaintiff also noted that other employees were being offered overtime work, while Defendants routinely scheduled Plaintiff for less than 40 hours weekly. Plaintiff again asked Mr. Wygant about why these things were happening. Mr. Wygant cryptically told Plaintiff, "It's Tim Lucas. There is nothing I can do." When Plaintiff asked Mr. Wygant if Plaintiff could speak to Defendant Lucas directly, Mr. Wygant told Plaintiff no.

12.    Eventually Plaintiff reported to the Human Resources (HR) Department about his concerns. HR confirmed some of the underlying facts that Plaintiff reported, like that he did not receive nearly the same training or necessary tools and equipment that other employees did. However, HR's lackluster response, and absence of plan for any action, also confirmed to Plaintiff that the status quo would be maintained and nothing would be done.

13.    Plaintiff sensed that Mr. Wygant was afraid of retaliation to press the issue any further on Plaintiff's behalf. Upon information and belief, Defendants were monitoring Mr. Wygant's phone. Defendant Lucas also frequently screamed and blew up at employees, and most who worked there were intimidated by him.

4

However, Mr. Wygant tried to be encouraging to Plaintiff in private and in their oral conversations, telling him things like Plaintiff was doing a really good job with his work and that "hopefully Tim [Lucas] sees that."

14.    In or around January 2025, in an incident where Plaintiff was hauling byproduct from WM's largest customer at the Wyoming location, Plaintiff arrived back in the yard later than expected because of a delay caused by the customer's facility. The same thing had happened to another white employee, Plaintiff's counterpart, when that employee was servicing the same route. Although the white counterpart employee never got into trouble for this situation that was inherently not the fault of Defendants' driver, Defendant Lucas was irrationally irate with Plaintiff when it happened to Plaintiff. Plaintiff could not understand why Defendants had this reaction to him accommodating the location's biggest account, especially when Plaintiff's white counterpart did the same thing without incident.

15.    After this incident, Mr. Wygant privately told Plaintiff outside of Defendant Lucas's presence that Plaintiff's job was in jeopardy. Mr. Wygant said that he did not agree with Defendant Lucas's negative opinion of Plaintiff, and Mr. Wygant was almost apologetic to Plaintiff when telling him that his job was in jeopardy, saying, "You are one of the best workers I have." When Plaintiff asked why this was happening, Mr. Wygant pointed to the skin on his own arm and said, "It's this. It's your skin, Chris." Mr. Wygant was referring to Plaintiff's Black race and indicating Mr. Wygant's belief that Defendants were treating him differently and poorly because of Plaintiff's race.

16. Sometime after this conversation, Plaintiff covered for his white counterpart while he was out on vacation, and therefore Plaintiff worked significantly more than normal – 72 hours during that week. When Plaintiff's white counterpart had earlier covered for Plaintiff when he was out for vacation, the white counterpart's hours were virtually the same as Plaintiff, since one person was doing the work of two employees.

17. But when Plaintiff received his paycheck for the week that he had been covering, his paycheck was short and reflected fewer hours than Plaintiff worked. Plaintiff went to Mr. Wygant to ask to have this corrected. Plaintiff learned that Mr. Wygant had gotten into trouble because of the extent of Plaintiff's hours for that week, even though there had been no problem when Plaintiff's white counterpart clocked essentially the same hours under the same circumstances. Plaintiff learned that Defendant Lucas said, "that piece of shit," referring to Plaintiff apparently, "is not going to make more money than me."

18. Defendant Lucas's statement echoed some of the other racist and resentful comments and other talk among various employees at the Wyoming location to which Plaintiff had been subject since he started there. Other employees often made comments that Plaintiff did not deserve what he earned, or commented jealously on items he owned, like an old Mercedes that Plaintiff had refurbished and drove to work. One maintenance employee asked Plaintiff in front of others what Plaintiff thought Defendants would do to that employee if he called Plaintiff a "n-----." He seemed to be baiting Plaintiff to become angry, implying that Defendants

would not do anything to him if he uttered that racial epithet.

19.    Plaintiff had tried to do his job and ignore this racist, hostile working environment. But Defendant Lucas trying to short Plaintiff money that he had earned and making this statement about him upset Plaintiff greatly and was the last straw for Plaintiff.

20.    Mr. Wygant told Plaintiff that he should make another report to HR about it. But Mr. Wygant also asked Plaintiff not to reveal where Plaintiff had learned about Defendant Lucas's actions and his statement because Mr. Wygant said he would be fired.

21.    Plaintiff reported Defendant Lucas's actions and statement to HR while trying to protect Mr. Wygant as the source of the information. Ashley Glass, the HR employee who took his report, seemed very concerned about Plaintiff's report and appeared to take it seriously. She told him that she would investigate right away. Indeed, she or someone from HR apparently went to the work stations of Mr. Wygant and Defendant Lucas the same day as part of the HR investigation. Mr. Wygant called Plaintiff and told Plaintiff that HR was on site, that Defendant Lucas was there too, and that Defendant Lucas was trying to get Plaintiff fired from his job.

22.    Despite what Mr. Wygant told Plaintiff, nothing happened immediately. Plaintiff heard nothing further from HR about its investigation, nor did Plaintiff get fired as Defendant Lucas wished. Plaintiff just put his head down and kept doing his job, hoping that HR would correct the situation. But Plaintiff

heard nothing further about HR's conclusions or that HR would do anything.

23.    A few months thereafter, Plaintiff was operating a bobtail truck for Defendants as part of his assigned job duties for the day in question. He left the vehicle parked without a trailer on the back because the landfill was closed the next day, which meant the trailer would not be required. Plaintiff did what he was told and parked the vehicle where he was told. He later learned that Defendant Lucas sought Plaintiff's termination for this act, claiming it was a violation of work rules, even though it was exactly what other employees did and complied with the instructions that Plaintiff had been given.

24.    Then Defendant Lucas caused Plaintiff to be written up for allegedly damaging a truck mirror that Plaintiff had been operating. When Plaintiff went to inspect the truck after he was told about Defendant Lucas's accusation, Plaintiff found absolutely no damage to the mirror in question. He took pictures and documented the lack of damage to the mirror, and he turned those pictures in to management. Management then advised Plaintiff that he was being put on paid leave because Plaintiff was accused by the maintenance department of damaging another truck that Plaintiff had been driving from some time period earlier, but claimed that maintenance had allegedly "lost" the paperwork on that claimed incident.

25.    An employee with whom Plaintiff was friendly, Shawn, told Plaintiff that he was there when Defendant Lucas was talking with a maintenance department employee named Jeff and a few other individuals, accusing Plaintiff of

causing this damage and appearing to be getting their stories straight. Jeff stated that he agreed with Defendant Lucas that the damage was allegedly caused by Plaintiff, but Plaintiff did not find this surprising because Jeff was a close friend of Defendant Lucas. However, Plaintiff had prior pictures of the second truck on which the maintenance department claimed Plaintiff had caused damage, and Plaintiff could prove that the damage in question was pre-existing to his operation of the truck. The fact that Plaintiff had these pictures to prove the falsity of the accusations made Plaintiff confident that the HR department would finally resolve this accusation in his favor and see that he was being subjected to racism. He called Ms. Glass in the HR department to alert her, and she told Plaintiff that it would be investigated while Plaintiff was out on paid leave.

26.     So Plaintiff was blindsided three weeks later, in August 2025, when Defendants fired him. The HR employee who participated in firing Plaintiff told him that they could not substantiate his racism report. The HR employee also told Plaintiff that he "should have known" that he caused damage, which Plaintiff continued to adamantly deny.

27.     Plaintiff called Defendants' corporate management and made another report that he had been subjected to unlawful racism and retaliation at the Wyoming location.

28.     Sometime after Plaintiff's firing, his friend Shawn who worked for Defendants called Plaintiff to report that maintenance workers in the garage made statements admitting to Shawn that they had "set up" Plaintiff to make the second

false accusation of truck damage to get him fired. Defendants later fired Shawn.

## COUNT I – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.* – RACE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

29.    Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

30.    Defendants violated Title VII when they subjected Plaintiff to a racially hostile work environment and when they consistently denied him training and opportunities based at least in part on Plaintiff's race.

31.    Defendants violated Title VII when they subjected Plaintiff to false accusations, shorted his paycheck, and eventually fired him citing false pretextual reasons, when Defendants in reality took those actions at least in part based on Plaintiff's race.

32.    Plaintiff suffered irreparable harm, in that he was unlawfully subjected to discrimination and a hostile work environment, and was eventually terminated from his employment. Plaintiff will continue to suffer harm unless the relief requested herein is granted.

### Statutory Prerequisites

33.    Pursuant to 42 U.S.C. § 2000e–5(e), Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

34.    EEOC advised Plaintiff by Notice of Right to Sue dated February 25, 2026, that he was entitled to institute a civil action within 90 days of receipt of said letter, in accordance with 42 U.S.C. § 2000e–5(f)(1).

## COUNT II – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.* – RETALIATION

35.    Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

36.    Defendants violated Title VII when Defendants subjected Plaintiff to increasingly negative and hostile treatment in retaliation for his reports about Defendants' discriminatory behavior based on Plaintiff's race.

37.    Defendants violated Title VII when they fired him in retaliation for his report of violations of Title VII.

38.    Defendants violated 42 U.S.C. § 2000e–3 when it engaged in these and other retaliatory acts as aforesaid.

39.    Plaintiff has suffered irreparable harm, and he will continue to suffer such harm unless the relief requested herein is granted.

## COUNT III – VIOLATION OF ELCRA - DISCRIMINATION ON THE BASIS OF RACE AND RETALIATION

40.    Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

41.    Defendants violated ELCRA when they subjected Plaintiff to a hostile working environment, took negative actions as to his employment, and otherwise discriminated against him on the basis of his race.

42.    Defendants violated ELCRA when they fired Plaintiff at least in part based on his race.

43.    Defendants violated ELCRA when they subjected Plaintiff to discrimination, adverse actions relating to his employment, and then fired him in retaliation for reporting violations of ELCRA.

44.    As a result of the foregoing, Plaintiff lost earnings and benefits and future earnings and benefits, suffered mental anguish, emotional distress, unfair reputational damage, and undue harm to his career, as well as incurred attorney fees and costs, for which Defendants are liable.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff requests that the Court grant the following relief for the Counts above: order that Plaintiff be returned to his prior employment position with Defendants at his prior rate of pay; award Plaintiff economic and compensatory damages in an amount that would fully compensate him for the injuries alleged herein resulting from the violations of Title VII and ELCRA, including but not limited to damages for mental anguish, emotional distress, unfair reputational damage, and undue harm to career and earnings; award Plaintiff exemplary and punitive damages, where applicable; award Plaintiff costs and reasonable attorney fees; award Plaintiff such other relief as may be just and equitable.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: May 22, 2026

By: /s/ Sarah R. Howard
Sarah Riley Howard
146 Monroe Center St NW, Suite 418
Grand Rapids, MI 49503
(616) 451-8496

12

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: May 22, 2026                    By: /s/ Sarah R. Howard
                                       Sarah Riley Howard
                                       146 Monroe Center St NW, Suite 418
                                       Grand Rapids, MI 49503
                                       (616) 451-8496
                                       showard@pinskysmith.com

13